Memorandum Opinion & Order entered. For the reasons explained in the accompanying order, Defendant's motion for summary judgment [44] is granted. The clerk is directed to terminate this case.**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELLE LARA-WOODCOCK, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Joan B. Gottschall |
| | ) | |
| v. | ) | Case No. 12 C 2423 |
| | ) | |
| UNITED AIR LINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Michelle Lara-Woodcock is a former employee of United Air Lines, Inc. ("United"). She worked for United as the only female Ground Equipment Mechanic at O'Hare International Airport for nearly ten years, until she became pregnant in 2008. She has sued United for sex and pregnancy discrimination and retaliation, pursuant to Title VII, 42 U.S.C. § 2000e (Counts I-III), and retaliatory discharge under Illinois common law (Count IV). Now before the court is United's motion for summary judgment on all of Lara-Woodcock's claims. Because, construing the facts and drawing all permissible inferences in Lara-Woodcock's favor, no reasonable jury could find that United discriminated against Lara-Woodcock based on her sex or pregnancy, retaliated against her for engaging in protected conduct, or discharged her in violation of Illinois law or public policy, the court grants the motion in its entirety.

## I. FACTS

The court takes the following facts from the parties' Local Rule 56.1 Statements of Facts ("SOFs"), to the extent that the facts are supported by admissible evidence and relevant to the

issues raised in the motion. Where the facts are disputed, the court takes no position as to which version of the disputed matter is correct. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).[1]

United is an international airline carrier that operates flights at O'Hare. After Lara-Woodcock's honorable discharge from the Air Force, United hired her as a Ground Equipment Mechanic on or about September 28, 1998, in the Ground Equipment Maintenance Department at O'Hare. During her time as a Ground Equipment Mechanic, Lara-Woodcock was the only female who worked in that capacity at O'Hare.

During the relevant time period, the Manager of Facility and Ground Equipment Maintenance at O'Hare was Thomas Reardon. Lara-Woodcock's supervisor was Phillip Danca, who reported to Reardon. Both Danca and Reardon had the authority to terminate employees. Lara-Woodcock's husband, William Woodcock, is also a United Ground Equipment Mechanic and serves as a union steward.

As a Ground Equipment Mechanic, Lara-Woodcock was required to be a union member. At all times during her employment with United, a Collective Bargaining Agreement ("CBA") controlled the terms and conditions of Lara-Woodcock's employment. The CBA set forth the job duties of a Ground Equipment Mechanic as well as the terms and conditions for a leave of absence.

---

[1]     Lara-Woodcock asks the court to strike United's SOF because it violates the court's local rules. The court notes that many of United's numbered "facts" actually include multiple facts, but it does not find the SOF so faulty as to warrant striking it. Lara-Woodcock also objects to certain of United's facts. She argues that one sentence of SOF ¶ 43 improperly relies on an affidavit, but the court finds that sentence irrelevant to the issues in dispute, rendering her objection moot. Both Lara-Woodcock and United have also raised specific objections to many of the other party's facts. The court has evaluated these objections, and the following summary of the facts includes only those facts that are supported by record evidence. Where a fact misstates the record evidence, the court has relied on the actual deposition testimony or other exhibit cited in support of the fact.

During the relevant time period, United maintained Rules of Conduct for union-represented employees such as Lara-Woodcock. The Rules of Conduct specified violations which would result in discharge unless mitigating factors were applicable. Rule of Conduct No. 8 stated that "[r]efusing to cooperate when ordered to provide information, including written statements, to the Company during an investigation" could result in discharge. Rule of Conduct No. 29 stated that "[f]ailing to comply with a direct order given by a Supervisor or other person in authority" would result in disciplinary action, up to and including discharge. Rule of Conduct No. 33 stated that "[u]nauthorized absence from work" would result in disciplinary action, up to and including discharge.

## A. Lara-Woodcock's Pregnancy and Lifting Restriction

As a Ground Equipment Mechanic, Lara-Woodcock repaired various support equipment used by United at O'Hare. Until January 2008, she worked in the machine shop; she then worked on vehicles on what mechanics referred to as the "floor." (Def.'s SOF Ex. 4 (Lara-Woodcock Dep.) 30:20-31:7, ECF No. 47-7.) Her duties on the floor included putting on tires and brakes, charging and replacing batteries, changing oil, and performing other electrical and mechanical work on the vehicles. (*Id.* at 35:24-36:16.) From January 2008 until June 2008, Lara-Woodcock worked the day shift (6:00 a.m. to 2:30 p.m.). For three or four years before that, she had worked the midnight shift (10:00 p.m. to 6:30 a.m.). Shift selection was based on seniority.

In January 2008, Lara-Woodcock learned she was pregnant with twins. In or about April 2008, she and her husband spoke with Matthew Nordmoe in United's Performance and Labor Department. Lara-Woodcock had concerns about performing her job duties satisfactorily while pregnant and wanted to get her "ducks in a row."

At the time Lara-Woodcock and her husband spoke with Nordmoe, she had no physical restrictions. She and her husband told Nordmoe that, at some point, she might be placed on a lifting restriction or be otherwise unable to perform her job and asked what she should do at that point. A couple of days later, Lara-Woodcock and her husband spoke to Reardon. Danca was also present for the conversation. Lara-Woodcock and her husband informed Reardon that they had gone to the Performance and Labor Department because of her concerns about not being able to perform her job satisfactorily due to the pregnancy. Lara-Woodcock did not ask for a particular accommodation at the time.

On or about May 5, 2008, Lara-Woodcock's doctor placed her on a thirty-pound lifting restriction, in effect through her October 12, 2008, due date. The doctor filled out Family and Medical Leave Act ("FMLA") paperwork to certify the lifting restriction, but Lara-Woodcock testified that she did not want to request FMLA leave, but only to put the lifting restriction in place. (*Id.* at 89:10-90:21.)[2] Shortly thereafter, Lara-Woodcock spoke to Danca about the lifting restriction. She told Danca that she was having pains in her stomach and that her doctor did not want her to lift anything heavy. She asked if someone else could help her lift tires and other things weighing more than thirty pounds. According to Lara-Woodcock, Danca agreed. Lara-Woodcock testified that at the time, there were no tasks other than lifting heavy tires that she could not perform. (*Id.* at 93:19-21.)

The parties disagree as to whether the Ground Equipment Mechanic position had a lifting requirement. Lara-Woodcock contends that she could use a machine to lift heavy items. She

---

[2]     On the paperwork submitted by the doctor, entitled an "Employee Serious Health Certification Form," the box "no" is checked next to "Block/continuous leave," and under "parameters of FMLA leave" is written, "Pt. will be on block/cont. leave due to incapacitation by pregnancy or with possible complications." (Def.'s SOF Ex. 11 (Health Certification Form), ECF No. 47-13.) The form explains that Lara-Woodcock "is receiving routine prenatal care. She is currently under a 30# pound weight restriction." (*Id.*)

also points to Reardon's deposition testimony that the job description for a Ground Equipment Mechanic does not state that a mechanic is required to lift a certain amount of weight (Pl.'s SOF Ex. B (Reardon Dep.) 65:11-13, ECF No. 54-3), and that there is no physical test that a mechanic is required to pass (*id.* at 64:5-24). Reardon also testified, however, that mechanics are required to lift parts and equipment. (*Id.* at 66:4-68:2.) Lara-Woodcock testified at deposition that, when she changed tires on certain vehicles during her work on the floor, she had to "pull the tire down and pull it off and then to lift it up . . . . These are pretty big tires, so we're talking 50 pounds or more." (Lara-Woodcock Dep. 38:6-17.) She stated that as her pregnancy progressed, it was "becoming increasingly difficult to lift up these 80-pound tires and put them on the tractor," and that she regularly had to change such tires. (*Id.* at 79:23-80:9.)

On June 12, 2008, Reardon instructed Danca to send Lara-Woodcock home because she had been placed on a thirty-pound lifting restriction. Danca testified that he had not had any issues with Lara-Woodcock's performance until that time and had received no complaint from her or other employees that she was unable to do her job. (Pl.'s SOF Ex. C (Danca Dep.) 49:8-20, ECF No. 54-4.) According to United, Lara-Woodcock was sent home because her supervisors believed that her position had a seventy-pound lifting requirement and that she could not perform her job duties with the thirty-pound lifting restriction. United cites the deposition of Richard Bolanowski, Senior Staff Representative for Labor Relations at United during the relevant period. Bolanowski testified that Lara-Woodcock was sent home "[b]ecause it was believed that she had to be able to lift 70 pounds." (Def.'s SOF Ex. 2 (Bolanowski Dep.) 66:6-7, ECF No. 47.) He further testified that although "her supervisor" believed there was a lifting requirement for her position (*id.* at 66:15), "there is no requirement for a ground equipment mechanic to be able to lift 70 pounds," and the supervisor's belief was "wrong" (*id.* at 68:1-10).

On June 12, 2008, after Lara-Woodcock was sent home, she and her husband again went to speak to Nordmoe in the Performance and Labor Department. In his absence, they spoke to Diane Raucci, a member of United management who is now deceased. Lara-Woodcock told Raucci that she felt she had been discriminated against. Lara-Woodcock told Raucci, "I am not injured, I am pregnant." Raucci sent an email to Bolanowski stating that she told Lara-Woodcock that light duty assignments were available only for occupational injuries. (Pl.'s SOF Ex. 111 (Raucci Email June 12, 2008), ECF No. 54-28.)

Lara-Woodcock was placed on an unpaid FMLA leave and was later placed on Extended Illness status because her condition would last more than sixteen days. On or about July 14, 2008, her doctor completed an Absence Certificate, which Lara-Woodcock submitted to United. Her doctor certified that Lara-Woodcock could perform restricted work as of May 21, 2008, and that she was restricted from lifting more than thirty pounds.

On or about July 17, 2008, Lara-Woodcock filed a charge of discrimination with the EEOC. On or about August 8, 2008, a Reasonable Accommodation Process ("RAP") meeting was held. The RAP meeting was led by Bolanowski and attended by Lara-Woodcock, her husband, Raucci, Supervisor Michael Cklamovski, and two union representatives. According to Lara-Woodcock, at the meeting, she questioned Bolanowski about why she was not accommodated, and he agreed that she should not have been sent home because light-duty work was available that she could perform with the lifting restriction. (Lara-Woodcock Dep. 118:9-21.) After the meeting, Lara-Woodcock's husband prepared a grievance on her behalf seeking back pay and other benefits for the time period she had been placed on Extended Illness status. She was paid 43 days' back pay and returned to work as a mechanic on August 11, 2008. Then

eight months pregnant, she was placed on the midnight shift on light duty, where she worked without any performance issues or complaints until the twins were born on August 31, 2008.

## B. Lara-Woodcock's Request for a Voluntary Furlough

After the birth of the twins, Reardon allowed Lara-Woodcock to stay home on authorized no pay ("ANP") status until about August 6, 2009. While on ANP, Lara-Woodcock continued to accrue seniority and received full benefits. She understood that her ANP status would be "week-to-week," as budget and manpower needs permitted.

United's management had the right to determine how many employees it needed for a particular job at a particular time, to establish staffing levels for each position, to change staffing levels from time to time, and to change start and end times. In or about October 2008, while Lara-Woodcock was still on ANP status, United announced an involuntary furlough. On or about October 2, 2008, United notified Lara-Woodcock that she would be furloughed on December 7, 2008. Under the CBA, furlough is done by seniority. Lara-Woodcock was identified for involuntary furlough because she did not have enough seniority to hold her position. On November 5, 2008, United notified Lara-Woodcock by letter that the expected date she would be furloughed had been extended to on or about January 11, 2009. A letter to Lara-Woodcock dated December 17, 2008, stated that she would be placed on layoff status as of January 11, 2009. (Def.'s SOF Ex. 20 (Notice of Furlough Dec. 17, 2008), ECF No. 47-22.) Lara-Woodcock testified that she informed Reardon that she would accept the furlough. (Lara-Woodcock Dep. 150:19-22.) In a letter dated January 7, 2009, however, United informed Lara-Woodcock that she would not be placed on involuntary furlough after all. (Def.'s SOF Ex. 21 (Cancellation of Furlough Notice Jan. 7, 2000), ECF No. 47-23.) She remained off work on ANP status.

Although there were no provisions in the CBA for a voluntary furlough, from time to time, United offered voluntary furloughs to those employees who had not been identified for involuntary furlough, in an attempt to minimize the impact of involuntary furloughs. An employee continues to accrue seniority while on voluntary furlough but does not receive benefits. Reardon testified that "from time to time the company at a corporate level within the mechanics group—that generally meant San Francisco labor relations—would offer, in an attempt to minimize the impact of involuntary furloughs, . . . voluntary furlough programs to employees in the mechanic classification." (Reardon Dep. 42:21-43:3.) He testified that voluntary furloughs were handled on a case-by-case basis. (*Id.* at 136:5-10.)

For the furlough period effective January 11, 2009, the time window to request a voluntary furlough was between November 3, 2008, and December 5, 2008. William Woodcock learned about the voluntary furlough in or about October 2008. He testified that he informed Lara-Woodcock about it (Def.'s SOF Ex. 8 (Woodcock Dep.) 50:10-21, ECF No. 47-10), although she testified that neither of them found out about the voluntary furlough until December 2008 (Lara-Woodcock Dep. 134:17-19). Lara-Woodcock and her husband both testified at deposition that the deadline for the voluntary furlough was December 2008. (Lara-Woodcock Dep. 132:15; Woodcock Dep. 63:6-9.) Lara-Woodcock testified that she "verbally requested a voluntary furlough in the end of January [2009]." (Lara-Woodcock Dep. 63:10-13.) Woodcock communicated with Reardon regarding Lara-Woodcock's request for a voluntary furlough in or about January 2009, and with Kellee Allain in the Labor Relations Department in March 2009.

According to United, Lara-Woodcock's requests for a voluntary furlough were denied because they were made after the deadline to request a voluntary furlough. Reardon and Bolanowski testified at deposition that United was not able to grant a voluntary furlough if an

employee requested one outside the time frame for doing so, or at a time when there was no furlough period.  (Reardon Dep. 136:18-23; Bolanowski Dep. 31:10-12.)  Reardon testified that United could not grant a voluntary furlough outside of a furlough period because there were no provisions to do so in the CBA, and that he had no authority to approve a request for a voluntary furlough.  (Reardon Dep. 134:24-135:4, 135:23-136:5.)

Lara-Woodcock contests that any such deadline existed in practice.  She points to the fact that a voluntary furlough was approved for Claudio Prunotto, another Ground Equipment Mechanic, in 2008.  Prunotto had more seniority than Lara-Woodcock and had not been identified for involuntary furlough.  He submitted a voluntary furlough application on August 10, 2008, and Reardon received the request on August 11, 2008.  Although he was Prunotto's supervisor, Reardon did not personally make the decision to approve the request; it was approved by United management.  Prunotto began his voluntary furlough on October 18, 2008.  Although still employed by United, Prunotto has not worked since that date.  Prunotto testified that he was asked to return from voluntary furlough in approximately November 2011.  (Pl.'s SOF Ex. D (Prunotto Dep.) 33:10-11, ECF No. 54-5.)  He did not return to work, however, and has remained on voluntary furlough.  He testified that he incurred a non-work-related shoulder injury while on voluntary furlough.  (*Id.* at 40:23-41:10.)

## C.  Lara-Woodcock's Requests for Leave

After Lara-Woodcock had been on ANP status for almost a year, Reardon directed her to return to work on August 6, 2009.  Reardon testified that he received a directive that he could no longer allow Lara-Woodcock to remain on ANP status because staffing levels had changed:

> There came a point in time where we were calling overtime again.  The budgets at a corporation being what they are, things changed, and the approved no pay was not being offered any longer.

As I say, we were using overtime, and then the . . . budget director from the business management office, who had authorized this in the first place and shared it with all the managers for the airport operations groups, contacted all of us. She contacted me, and said, If you've got anybody off on . . . approved no pay—and she specifically knew that Michelle had been—I think Michelle was the only one from the group that [was]—[that] had come to an end at this point and . . . she needed to come back to work.

(Reardon Dep. 123:19-124:9.)[3]

Lara-Woodcock did not return to work on August 6, 2009. During her deposition, she admitted that she was not authorized to be absent from work, but stated that there were "other circumstances surrounding that." (Lara-Woodcock Dep. 203:17-20.) She testified that she "did call in every day to let them know I wasn't going to be there." (*Id.* at 160:19-21.) Lara-Woodcock testified, "I decided that United wouldn't provide me with an adequate place to pump my breast milk. I didn't return for that reason." (*Id.* at 55:1-3.)

On August 10, 2009, Performance and Labor Relations Supervisor Sheila Siggal tried unsuccessfully to reach Lara-Woodcock by telephone, then sent Lara-Woodcock a direct order to contact Siggal by August 14, 2009. The letter warned that a failure to comply with the direct order would be a violation of Rule of Conduct No. 29. Lara-Woodcock did not contact Siggal. According to Lara-Woodcock, after she received the August 10, 2009, letter from Siggal, she

---

[3]    Lara-Woodcock contests that Reardon was given such a directive, but the evidence she cites does not create a genuine dispute as to this fact. She points to the fact that Reardon testified that he did not receive any documentation of what the budget director had told him on the phone. (*Id.* at 192:13-15.) She also contends that Reardon did not need permission to give ANP to an employee and that ANP was available after 2009. In support, she cites the deposition testimony of William Skjoldager, a Performance and Labor Relations Supervisor at United. Skjoldager testified that Reardon changed some of Lara-Woodcock's unauthorized absences to authorized absences. He stated that Reardon "updated the calendar to erase a couple more months of unauthorized absences . . . just to get [Lara-Woodcock] to return to work and there was no mention of giving her any . . . discipline. The intent was to get her to come back to work." (Pl.'s SOF Ex. E (Skjoldager Dep.) 41:11-23, ECF No. 54-6.) Skjoldager further testified that managers could authorize ANP to employees after 2009. (*Id.* at 56:15-57:6.) None of this testimony bears on whether Reardon was given a directive to order Lara-Woodcock back to work on August 6, 2009.

received a call from Supervisor Debra DiSantis and told DiSantis she was not ready to return to work, was uncomfortable talking with DiSantis about her situation, and was not sick. Reardon sent Lara-Woodcock an email asking her to call him. (Def.'s SOF Ex. 27 (Email Aug. 11, 2009), ECF No. 47-29.) She left him a voicemail but did not speak to him.

On or about August 12, 2009, Lara-Woodcock submitted a Request for Leave of Absence to "return to school to complete [her] industrial engineering degree." United maintained a Leave of Absence Policy which provided for approved time away from work for a specific period of time. Whether a leave of absence would be granted depended on United's business and service needs. Each type of leave had its own requirements and qualifications. With respect to educational leave, the policy stated that "[e]mployees must present evidence of enrollment in, or application and acceptance to, an accredited college, university, or trade school. Furthermore, the employee is required to take a full workload per semester." (Def.'s SOF Ex. 1-B (Leave of Absence Policy), ECF No. 47-1.)[4]

Reardon denied the request for educational leave. Prior to denying the request, he had no communication with Lara-Woodcock regarding the request. During the time period Reardon managed the Ground Equipment Maintenance Department, no other employee requested an educational leave. Bolanowski told Reardon that whether or not the leave should be approved depended upon the staffing needs in the department.

On September 4, 2009, Lara-Woodcock submitted a Request for Leave of Absence "for pregnancy/childcare" related issues. This request was also denied by Reardon. Lara-Woodcock

---

[4]     Lara-Woodcock denies that the policy required her to submit any evidence of enrollment, application to, or acceptance by an educational institution. In support, however, she cites only her deposition testimony that she did not know why her request for leave was not approved (Lara-Woodcock Dep. 187:22-24) and Reardon's testimony that her request was denied because the company was not in the position, giving staffing levels, to grant educational leaves of absence (Reardon Dep. 205:18-20; 206:14-24).

was the only employee to ever request any type of pregnancy leave during Reardon's time as Ground Equipment Manager. United contends that Reardon denied the request for leave because staffing levels had not changed. In support, it cites Reardon's deposition testimony, which states that he denied the request for leave for the same reasons that he denied the request for educational leave. (Reardon Dep. 209:20-22.) Reardon testified that United's "staffing situation hadn't changed and that from that perspective we weren't in a position to grant any leaves of absence." (*Id.* at 210:10-12.)

Lara-Woodcock contests that "staffing levels" required her to return to work and argues that mechanics were not being recalled from involuntary furlough in August 2009. In support, she cites a list of mechanics on involuntary furlough that shows that several were not recalled until 2012. (Pl.'s SOF Ex. F (Involuntary Furlough List), ECF No. 54-7.)[5] As of January 11, 2009, United had placed eight Ground Equipment Mechanics on involuntary furlough. At the end of 2009, only two of those had been recalled to work. At no point prior to December 2011 did United recall any of the other six mechanics.

### D. The Fact Finding Investigation and Investigative Review Hearing

Beginning on or about August 18, 2009, Performance and Labor Relations Supervisor William Skjoldager sent Lara-Woodcock a series of letters containing direct orders to attend a fact finding investigation. The letters warned that a failure to comply with the direct order would be a violation of Rules of Conduct Nos. 8, 29, and 33. Skjoldager also directed Lara-Woodcock to submit a completed Absence Certificate before the fact finding investigation. Lara-Woodcock did not submit an Absence Certificate because it was supposed to be completed by a physician and she was not sick.

---

[5] She also cites Skjoldager's deposition, but the cited portions are irrelevant to the statement.

Lara-Woodcock did not attend a fact finding investigation scheduled for August 24, 2009, because her child was ill. On September 7, 2009, she attended a rescheduled fact finding investigation, which was also attended by her husband, Skjoldager, and Wehrenberg. According to Lara-Woodcock, Skjoldager went over the alleged violations of the Rules of Conduct and asked why she had not returned to work. Lara-Woodcock contends that she told Skjoldager she did not have a sanitary place to express breast milk and that she was worried about chemicals in the work area. Skjoldager testified that he told Lara-Woodcock that there was a private location in the women's locker room. (Skjoldager Dep. 71:19-20.) Lara-Woodcock testified that she requested a place to express her breast milk other than the women's bathroom, where she argues that she would have had to sit on a toilet seat to secure any privacy. (Lara-Woodcock Dep. 212:14-17.)[6] She testified that her "accommodations were not met satisfactorily" because she wanted "a private place, that I can express my breast milk and I wouldn't be in contact with any other chemicals in the shop." (*Id.* at 212:14-17.)

After the September 7, 2009, fact finding investigation, Skjoldager met with Reardon and reported his findings from the investigation. Skjoldager also reported his findings to his manager. Reardon claims that once he was notified about Lara-Woodcock's requests, he immediately began to look for a private location for Lara-Woodcock to express breast milk. On September 10, 2009, Reardon sent a letter to Lara-Woodcock stating:

> We are in receipt of your request for certain accommodations that you will need to return to work. Specifically, you have requested time off at work to take care of your breast feeding needs, a private secure area and a secure refrigerator for storage.

---

[6] Lara-Woodcock refers to the women's "bathroom," while United calls the room the women's "locker room." Lara-Woodcock testified at deposition that the locker room and bathroom were the same thing, and that there were lockers and benches in an open area of the room. (*Id.* at 209:8-21.) The room also contained showers, sinks, and toilet stalls.

Please be advised that United will accommodate all of these requests. Specifically, effective immediately,

- A lock has been installed on the women's locker room door to provide you a private location.
- A locking refrigerator will be provided for your exclusive use.
- You will be allowed adequate time to express milk during your two normal break times and your lunch break.

(Def.'s SOF Ex. 33 (Sept. 10, 2009, Letter), ECF No. 47-33.)

The letter stated that Lara-Woodcock was expected to report to work for the midnight shift on September 18, 2009. (*Id.*) Lara-Woodcock was told that she could lock the locker room door when she was expressing breast milk. Skjoldager could not verify whether a lock was actually placed on the women's restroom door. (Skjoldager Dep. 94:19-22.)

Lara-Woodcock continued to refuse to return to work because, she argues, no accommodations were made. She testified at deposition that she did not provide "written documentation" to United to support her absence from work after August 6, 2009, but she "expressed verbally to them" why she was absent. (Lara-Woodcock Dep. 215:24-216:5.) She testified that she believed the law did not require her to express breast milk in a toilet stall. (*Id.* at 175:4-6.)

On October 1, 2009, Skjoldager sent Lara-Woodcock a third direct order to attend a fact finding investigation scheduled for October 13, 2009. The letter stated that the accommodations needed for her to return to work had been met and that she had been expected to return to work on September 18, 2009. (Def.'s SOF Ex. 32 (Oct. 1, 2009, Letter), ECF No. 47-34.) It warned that a failure to comply with the direct order would be a violation of the Rules of Conduct and would put Lara-Woodcock's job and benefits in jeopardy. (*Id.*)

Lara-Woodcock did not attend the October 13, 2009, fact finding investigation, because she had a medical emergency. On October 28, 2009, she attended a fact finding investigation, along with her husband, Skjoldager, and Wehrenberg. According to Lara-Woodcock, she told Skjoldager the bathroom was unacceptable and that she wanted a secure place to express breast milk that was not a toilet stall. She testified at deposition that she would not answer some questions about her son's medical condition during the fact finding investigation because she believed they were irrelevant to the investigation. (Lara-Woodcock Dep. 230:8-21.)

After the October 28, 2009, fact finding investigation, Skjoldager reported his findings to Reardon and to his manager. In consultation with his manager, Skjoldager decided to prepare proposed charges for Lara-Woodcock's discharge for violation of Rules of Conduct Nos. 8 and 33. Lara-Woodcock had not received any progressive discipline prior to that point.

Lara-Woodcock was issued a Notice of Investigative Review Hearing to be held on December 17, 2009, concerning her proposed discharge. Senior Staff Representative William Byrnes conducted the Investigative Review Hearing, which was also attended by Lara-Woodcock, Woodcock, Raucci, Skjoldager, and two union representatives. Lara-Woodcock had an opportunity to present exhibits and say whatever she wanted during the hearing. According to Lara-Woodcock, she told Byrnes that she felt Reardon was angry that she had filed an EEOC charge and that because of that, he would not grant her leaves of absence or a voluntary furlough. Reardon testified at deposition that he was unaware that Lara-Woodcock had filed an EEOC Charge prior to the Investigative Review Hearing. (Reardon Dep. 245:6-9.) Skjoldager testified at deposition that he did not know Lara-Woodcock had filed an EEOC Charge prior to his deposition, although he had "heard that there were lawsuits" after she was separated from the company. (Skjoldager Dep. 49:20-50:18.) Lara-Woodcock testified at deposition that she

mentioned the EEOC charge during the Investigative Review Hearing. (Lara-Woodcock Dep. 232:6-12.)

## E. Lara Woodcock's Termination

After the Investigative Review Hearing, Byrnes decided to terminate Lara-Woodcock's employment effective December 28, 2009, because she violated Rule 8 when she refused to cooperate when ordered to provide information during an investigation, and because she violated Rule 33 when she remained absent from work without authorization.

United sent out notice of an involuntary furlough period scheduled to begin on January 31, 2010. For the furlough period effective January 31, 2010, the time window to request a voluntary furlough was between December 15, 2009, and December 28, 2009. (Pl.'s SOF Ex. 82 (Involuntary Furlough Timeline), ECF No. 54-23.) A notice of voluntary furlough for mechanics was issued that stated that mechanics could apply for a voluntary furlough at that time, although Reardon testified at deposition that he was not sure "that this furlough ever happened." (Reardon Dep. 256: 22-23.) On or about December 19, 2009, Lara-Woodcock submitted a request for voluntary furlough. She testified that she applied for a voluntary furlough "Because I had requested . . . leaves of absences prior and been pretty much trying to do what I could to save my job." (Lara-Woodcock Dep. 154:13-15.) The request for a voluntary furlough was denied.

Lara-Woodcock appealed her termination to the Joint Board of Adjustments ("JBA"), and a hearing was scheduled. She testified at deposition that prior to the hearing before the JBA, she agreed to a settlement granting her a voluntary furlough. (*Id.* at 237:19-24.) She did not sign the settlement agreement, however. (*Id.* at 239:2-8.) She learned a few days after the agreement was reached that, as part of the settlement, she would have to sign a legal release of her then-pending claims. Lara-Woodcock did not sign the release and never returned to work.

Lara-Woodcock filed a second charge of discrimination with the EEOC in April 2010, alleging retaliation and disability discrimination. She filed a complaint in this court on April 2, 2012. The complaint alleges that United discriminated against her based on her sex and pregnancy, in violation of Title VII (Counts I and II), and retaliated against her for engaging in protected conduct (Count III). In Count IV, she brings a state-law claim of retaliatory discharge based on her alleged "refusal to violate public law in utilizing an unsanitary toilet seat in an unsanitary women's restroom to express her breast milk." (Compl. 10, ECF No. 1.)

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

### A. Title VII Claims (Counts I-III)

1. <u>Standards</u>

Lara-Woodcock alleges that United discriminated against her based on her sex and her pregnancy, and retaliated against her for filing an EEOC charge, in violation of Title VII. To withstand United's motion for summary judgment with respect to her claim of sex discrimination

pursuant to Title VII, 42 U.S.C. § 2000e, *et seq*, Lara-Woodcock must put forth evidence that she suffered an adverse employment action and that the action was the product of discrimination based on her sex. The legal analysis for her pregnancy discrimination claim is the same. *See Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 842-43 (7th Cir. 2011) (explaining that for purposes of Title VII, discrimination based on pregnancy is discrimination based on sex). The Pregnancy Discrimination Act ("PDA") incorporated discrimination based on "pregnancy, childbirth, or related medical conditions" into the forms of sex discrimination actionable under Title VII. 42 U.S.C. § 2000e(k). Under the Act, "pregnant women are to be treated the same for employment-related purposes as other persons." *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1011 (7th Cir. 1997).

There are two ways to establish discrimination. Under the "direct method," a plaintiff must "point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue." *Egonmwan v. Cook Cnty. Sheriffs Dep't*, 602 F.3d 845, 849 (7th Cir. 2010). Alternatively, under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), she must establish a prima facie case of discrimination. To establish a prima facie case, she must present evidence that (1) she was a member of a protected class (i.e., she was a woman, or she was pregnant and her employer knew that she was pregnant); (2) she was performing her job duties satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class (i.e., male or nonpregnant) employees were treated more favorably. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 550 (7th Cir. 2011). If any element of the prima facie case is lacking, the plaintiff loses. If she successfully establishes a prima facie case, she must then show that the defendant's

proffered "legitimate, non-discriminatory reasons for [its] actions. . . were pretextual." *Egonmwan*, 602 F.3d at 850.

With respect to her retaliation claim, Lara-Woodcock can overcome summary judgment using the direct method by showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the protected activity was causally related to the adverse employment action. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011). Alternatively, she can employ the indirect method to show that (1) she engaged in activity protected by law; (2) she met her employer's legitimate expectations; (3) she suffered a materially adverse action; and (4) she was treated less favorably than a similarly situated employee who did not engage in activity protected by law. *See Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013). If she establishes a prima facie case under the indirect method, United must articulate a nondiscriminatory reason for its action; if it does, Lara-Woodcock bears the burden to demonstrate that United's reason is pretextual. *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009).

### 2. Forced Leave Based on the Lifting Restriction and Assignment to the Night Shift

It is undisputed that United placed Lara-Woodcock on unpaid FMLA leave and Extended Illness Status against her wishes. After engaging in a Reasonable Accommodation Process involving local management and union representatives, however, United determined that it could accommodate the lifting restriction through light-duty work, gave Lara-Woodcock back pay, and returned her to work. Lara-Woodcock argues that she can establish her claim that the forced medical leave was discriminatory under the direct method. United responds that no violation of Title VII occurred because Lara-Woodcock was placed on leave because of her lifting restriction, not her sex or pregnancy.

19

As explained above, to withstand summary judgment using the direct method, Lara-Woodcock must put forth evidence that she suffered an adverse employment action that was motivated by discrimination. The forced leave constitutes an adverse employment action, despite Lara-Woodcock's reinstatement and back-pay award. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 780 (7th Cir. 2006) ("We find persuasive the reasoning of the Second and Sixth Circuits, which have concluded that the reinstatement of an employee after a lengthy suspension from work does not prevent the employee from pursuing Title VII claims, even where back pay was awarded."). Although she received back pay, Lara-Woodcock alleges that she suffered additional damages, such as emotional distress, as a result of being forced to take leave.

Lara-Woodcock contends that she has presented direct evidence that United discriminated against her by forcing her to take unpaid medical leave. She claims that United sent her home when she was still capable of performing her job duties. She also claims that United failed to follow its own policies that required it to accommodate her. She argues that United's failure to follow its own established practices constitutes circumstantial evidence of a discriminatory motive for its actions.

Assuming that a company's failure to follow its own regular procedures can, in some circumstances, constitute circumstantial evidence of discrimination, there is insufficient evidence in this case to support Lara-Woodcock's argument. First, no reasonable jury could conclude that Lara-Woodcock could perform her job duties despite the lifting restriction. The evidence in the record demonstrates that, although there was not a specific lifting requirement in the job description for the mechanics position, some lifting was required as a regular part of the job of maintaining vehicles on the floor. Lara-Woodcock stated during her deposition that she regularly had to change heavy tires. (Lara-Woodcock Dep. 79:23-80:9.) Reardon testified that

even though lifts could be used for heavy tires, mechanics needed to lift parts and equipment. (Reardon Dep. 66:4-68:2.) Lara-Woodcock told her supervisor, Danca, that she needed help lifting heavy tires during her pregnancy because she was experiencing pain and was under a lifting restriction. In sum, there is no support in the record for Lara-Woodcock's contention that she could do her job as a Ground Equipment Mechanic with no accommodation. The fact that no lifting requirement was explicitly set out in the Ground Equipment Mechanic job description does not create a genuine dispute of fact as to this point.

United's decision to send Lara-Woodcock home thus amounts to the denial of a light-duty assignment. United was not required under federal law to provide Lara-Woodcock with a light-duty position because she was pregnant. The duty to accommodate arises under the Americans with Disabilities Act, not Title VII, and temporary complications related to a normal pregnancy did not trigger that duty in 2008.[7] *See Serednyj*, 656 F.3d at 553-54 (7th Cir. 2011). The Seventh Circuit has held that an employer is not required to provide an accommodation for a pregnant employee unless it provides that accommodation for similarly situated non-pregnant employees. *Id.* at 548; *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012). The Seventh Circuit explained in *Serednyj* that a policy that denied light-duty accommodations for all non-work-related injuries complied with the PDA because it treated pregnant and non-pregnant employees the same. *Serednyj*, 656 F.3d at 548-49. In this case, there is no evidence that United made special arrangements for non-pregnant workers who requested a light-duty

---

[7]    The ADA Amendments Act of 2008 (ADAAA), Pub.L. No. 110–325, 122 Stat. 3553 (2008), expanded the definition of "disability," potentially bringing pregnancy-related complications within that definition. It does not apply to conduct that occurred before January 1, 2009, however, because Congress did not indicate that the changes apply retroactively. *Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009).

assignment but denied those accommodations to Lara-Woodcock. Nor is there evidence that the forced medical leave was imposed for any other reason than her lifting restriction.

Lara-Woodcock claims that United violated its own policies in refusing to accommodate her, but she presents no evidence as to what those policies were or how they were violated. Lara-Woodcock points out that United reinstated her with an accommodation and admitted that it was "wrong" not to accommodate her in the first place because there was work she could do. But the fact that she secured reinstatement through the Reasonable Accommodation Process does not mean that United's refusal to accommodate her violated its established policies or practices. Nor does it mean that United violated Title VII, absent evidence that it accommodated similarly situated non-pregnant employees. United's obligations to union members under the CBA are not coextensive with its obligations under federal anti-discrimination law; the fact that it determined it could accommodate Lara-Woodcock did not mean that Title VII required it to do so.

Lara-Woodcock was assigned to the night shift when she returned to work in August 2008. She claims that the assignment to the night shift constituted retaliation based on her protected conduct in filing an EEOC charge and in complaining to Raucci that she felt she had been discriminated against. Assuming for the purposes of the motion for summary judgment that the assignment constituted an adverse employment action, the claim nonetheless fails because a reasonable jury could not conclude that the assignment was retaliatory. Lara-Woodcock must present either evidence that causally connects the assignment to her protected activity, or evidence that she was treated less favorable than a similarly situated employee who did not engage in protected activity. Although the EEOC charge was filed in July 2008, nothing in the record indicates that the person who made the shift assignment was aware that the charge had been filed. More importantly, the record evidence does not suggest that, in assigning Lara-

Woodcock to the night shift, United failed to follow its policy of making shift assignments based on seniority. Nor is there evidence that similarly situated employees with seniority less than or equal to that of Lara-Woodcock were assigned to the day shift or otherwise treated more favorably with respect to shift assignments than she was.

      3.  <u>Denial of the Voluntary Furlough Request in January 2009</u>

In January 2009, while Lara-Woodcock was on ANP status, she requested a voluntary furlough. The request was denied. She argues that she was denied the furlough because she was female and had recently given birth, and because she complained about discrimination on June 12, 2008, and filed a charge of discrimination on July 17, 2008. With respect to her argument that the denial of the furlough constituted discrimination based on her sex or pregnancy, Lara-Woodcock proceeds under the indirect method, as she must. There is no direct evidence in the record that ties this decision to her sex or pregnancy.

Lara-Woodcock has undisputedly presented evidence that she is a member of a protected class, and the parties do not dispute that she was a satisfactory employee. She has also presented sufficient evidence to create a triable issue of fact as to whether she suffered an adverse employment action. An "adverse action must materially alter the terms and conditions of employment." *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). Examples of a material alteration include a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* United argues that the denial of the voluntary furlough was not an adverse employment action because it created no "material difference in the terms and conditions" of Lara-Woodcock's employment. But the denial of leave is not the type of trivial change in the conditions of employment that the "adverse action" requirement is

designed to weed out. The denial of leave could have constituted a significant change in benefits if leave was regularly made available to United employees but was denied to Lara-Woodcock for a discriminatory reason. Other courts have reasoned that, even when leave is available at the employer's discretion, the denial of sick time, vacation, or administrative leave may deprive an employee of an important employment benefit and thus suffice to establish an adverse employment action for the purposes of a discrimination claim. *See, e.g.*, *Krishnapillai v. Donahoe*, No. 09 C 1022, 2013 WL 5423724, at *13 (E.D.N.Y. Sept. 26, 2013) (denial of sick time and administrative leave); *Scott-Brown v. Cohen*, 220 F. Supp. 2d 504, 511 (D. Md. 2002) (denial of advanced sick leave). The Fifth Circuit has also held that the denial of paid or unpaid leave may constitute an adverse employment action for the purposes of a retaliation claim. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 521-22 (5th Cir. 2001). The court concludes that, if leave was routinely available, it could have constituted a significant benefit of Lara-Woodcock's employment at United.

To satisfy the final element of a prima facie case, Lara-Woodcock must present evidence that similarly situated employees outside of the protected class (i.e., male or nonpregnant) were treated more favorably than she was with respect to requests for a voluntary furlough. She relies on the fact that Claudio Prunotto was granted a voluntary furlough in August 2008. But, for several reasons, Prunotto and Lara-Woodcock were not similarly situated. For one, Prunotto was not identified for an involuntary furlough. The undisputed record demonstrates that United's policy was to offer voluntary furloughs to those employees who had *not* been identified for involuntary furlough, in an attempt to minimize the impact of involuntary furloughs. Second, Prunotto made his request at a time when an involuntary furlough was anticipated. Granting him voluntary furlough at that time thus served the purpose of minimizing the impact of the planned

involuntary furlough—which was the very point of offering voluntary furloughs. Lara-Woodcock made her request in January 2009, after the period to request a voluntary furlough had ended. More importantly, she made her request after the involuntary furlough planned for January 2009 had been cancelled. Thus, granting her a voluntary furlough would not serve the purpose of minimizing the impact of an involuntary furlough by saving the job of someone who might be laid off.

Lara-Woodcock attempts to argue that she and Prunotto were similarly situated because both made their requests outside of the official time line for voluntary furlough requests. But the fact that Prunotto made his request while layoffs were looming, and Lara-Woodcock made her request after the furlough was cancelled, means they were not similarly situated. Lara-Woodcock has therefore failed to make out a prima facie case of sex or pregnancy discrimination with respect to the denial of her request for a voluntary furlough.

There is also insufficient evidence in the record to create a dispute of fact as to whether Lara-Woodcock's voluntary furlough request was denied in retaliation for the filing of the EEOC charge. For the reasons explained above, Lara-Woodcock cannot make out a prima facie case of retaliation because she has not identified a similarly situated employee whose voluntary furlough request was granted. She must therefore proceed under the direct method with respect to her retaliation claim. The only circumstantial evidence that could tie the denial of her request to the filing of the EEOC charge is the timing of the request. But Lara-Woodcock complained to Raucci that she felt she was being discriminated against on June 12, 2008, and the charge was filed on July 17, 2008. The voluntary furlough request was not made until January 2009—approximately six months later. This temporal connection is too attenuated to overcome a motion for summary judgment. *See Leonard v. Eastern Ill. Univ.*, 606 F.3d 428, 432 (7th Cir.

2010) (finding a "six-month lag" between a civil-rights complaint and an alleged adverse action "too long to infer a link between the two").  Moreover, after the birth of her children, Lara-Woodcock was approved to be off work with benefits on ANP status for almost a year, despite her complaint and the fact that she filed the EEOC charge.  This further undermines her claim that her request for leave was denied for retaliatory reasons.

    4. <u>Denial of Leaves of Absence</u>

Shortly after she was ordered back to work on August 6, 2009, Lara-Woodcock requested an educational leave of absence and a childcare/pregnancy leave of absence.  Reardon denied both requests, on the grounds that the Ground Equipment Maintenance Department's staffing needs did not permit him to grant a leave of absence at that time, and that he had been instructed to order anyone on ANP status back to work.  The record contains no direct evidence that the denial of the requests for leave was based on Lara-Woodcock's sex or pregnancy.  It is undisputed that the supervisors such as Reardon had the authority to deny leave requests based on staffing needs; thus, Reardon's actions did not violate any company policy.  Lara-Woodcock must therefore again proceed under the indirect method.  As explained above, this requires her to identify a similarly situated employee outside of these protected classes who was treated more favorably.

There is no evidence in the record that any such employee exists.  The undisputed facts indicate that, during the time period Reardon managed the Ground Equipment Maintenance Department, no other employee requested an educational leave.  Lara-Woodcock was also the only employee to ever request any type of pregnancy or child care leave during Reardon's time as Ground Equipment Manager.  Nor is there evidence that another employee was granted some other type of personal leave.  Lara-Woodcock points to the fact that Prunotto has been allowed to

remain off work on voluntary furlough status since August 2008. But Prunotto and Lara-Woodcock were not similarly situated with respect to the type of leave requested and the timing of their requests. Lara-Woodcock was on ANP status at the time she requested the leaves of absence. ANP status was approved on a "week to week" basis as staffing levels permitted. She was also eligible to receive benefits. While on voluntary furlough, Prunotto was an inactive employee who was not receiving benefits; he would have to be recalled from furlough to return to work. The fact that United ordered an employee on ANP status back to work and denied her requests to take a leave of absence, while allowing an inactive employee to remain on a voluntary furlough, does not support an inference of discrimination.[8] United had the discretionary authority to approve leave without pay and determine its duration, as well as to grant other forms of leave. United had already allowed Lara-Woodcock to take almost a year of leave without pay when it ordered her to return to work.

Nor is there sufficient evidence to support a retaliation claim based on the denial of the leaves of absence. For the same reason discussed above with respect to the denial of the voluntary furlough, there is no direct evidence linking the denials of leave to Lara-Woodcock's complaint about discrimination or her EEOC charge, which was filed more than a year before the requests for leave. Furthermore, there is no evidence in the record that Reardon knew about the EEOC charge at the time he denied the requests for leave. Reardon testified that he was unaware that Lara-Woodcock had filed an EEOC Charge prior to the Investigative Review Hearing, while Skjoldager testified that he did not know Lara-Woodcock had filed an EEOC Charge until his

---

[8]     For this same reason, even if Lara-Woodcock could make out a prima facie case of discrimination with respect to the denial of leave, she has presented no evidence that United's stated non-discriminatory reason for the decision—its staffing needs—were a pretext for discrimination. Lara-Woodcock argues that the fact that she was ordered back to work when other employees remained on furlough is evidence of pretext, but the different employment status of the furloughed employees undermines this argument.

deposition.    Nor is there evidence that a similarly situated employee was treated more favorably than Lara-Woodcock with respect to requests for a leave of absence.

      5.  <u>Denial of December 2009 Voluntary Furlough Request and Termination</u>

The record shows that Lara-Woodcock did not return to work when she was ordered to do so on August 6, 2009.  This triggered a fact-finding investigative hearing.  Lara-Woodcock expressed concern about being able to pump breast milk for her children.  In a letter, United proposed an accommodation for her (allowing her to pump in the women's bathroom/locker room during breaks), and Reardon changed her unauthorized absences to approved absences. Lara-Woodcock failed to return to work when she was ordered to do so on September 18, 2009, however, triggering another fact-finding investigative hearing, which took place on October 28, 2009.    Lara-Woodcock claims that she told United the proposed accommodation was not acceptable to her.  After the October 28 hearing, United prepared charges for her discharge and held an Investigative Review Hearing on December 17, 2009.  Lara-Woodcock requested a voluntary furlough on December 19, 2009, and that request was denied.  United then terminated her employment effective December 28, 2009.  United based her discharge on violations of Rule 8 (failure to cooperate when ordered to provide information during a Company investigation), and Rule 33 (absence from work without authorization).

Lara-Woodcock contends that the denial of her request for a voluntary furlough in December 2009 was discriminatory and retaliatory.  As explained above, to establish this claim using the indirect method, she must present evidence that a similarly situated employee was treated more favorably than she was.  She again relies on the fact that Prunotto was granted a voluntary furlough in August 2008 and has been allowed to remain on furlough since that time. But Prunotto and Lara-Woodcock were not similarly situated at the time they made their requests

for furlough. Most importantly, Lara-Woodcock had just participated in an Investigative Review Hearing, and charges had already been prepared for her termination. Under the circumstances, with Lara-Woodcock's discharge imminent, a reasonable jury could not find that the denial of the furlough was discriminatory. Nor has Lara-Woodcock presented evidence that there was any connection between the denial of the furlough and the EEOC charge filed almost a year and half prior to the denial, so as to sustain a retaliation claim.

Lara-Woodcock also contends that her termination was discriminatory. Whether this claim can survive summary judgment turns on whether United's stated reasons for discharging her are worthy of credence. United argues that Lara-Woodcock was terminated because of unexcused absences and because she failed to cooperate with the fact finding investigations. Under United's Rules of Conduct for union employees, either of these constituted grounds for a discharge. "It is well-established that an employee can be terminated for violations of valid work rules that apply to all employees." *Pernice v. City of Chi.*, 237 F.3d 783, 785 (7th Cir. 2001). Lara-Woodcock, however, argues that neither reason was valid.

Lara-Woodcock claims that her absences were not "unexcused" because she could not return to work when no appropriate accommodations were made for her to express breast milk. She points out that, under the Illinois Nursing Mothers Act, an employer must "make reasonable efforts to provide a room or other location, in close proximity to the work area, other than a toilet stall, where an employee . . . can express her milk in privacy." 820 Ill. Comp. Stat. 260/15.

Under Title VII, United was required to treat Lara-Woodcock the same way it would have treated her if she were not pregnant. Discrimination against a woman who is breast-feeding may be actionable as sex discrimination. *See EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425, 430 (5th Cir. 2013). A number of courts have concluded that an employer is not required to offer

additional accommodations for breastfeeding under Title VII or the PDA, beyond those offered to other employees who need to tend to personal needs at work. *See, e.g.*, *Puente v. Ridge*, 324 F. App'x 423, 428 (5th Cir. 2009) (concluding that a breast-feeding mother who asked for additional break time never "received less than the status quo" received by all other employees); *Martinez v. N.B.C., Inc.*, 49 F. Supp. 2d 305, 310-11 (S.D.N.Y. 1999); *Fejes v. Gilpin Ventures, Inc.*, 960 F. Supp. 1487, 1491 (D. Colo. 1997) (collecting cases). But other courts have concluded that a failure to accommodate a nursing mother can constitute pregnancy-based discrimination. *See, e.g.*, *Martin v. Canon Business Solutions*, No. 11 C 2565-WJM-KMT, 2013 WL 4838913, at *8 n.4 (D. Colo. Sept. 10, 2013) ("Because human physiology is such that one only lactates as a by-product of pregnancy, the Court has little difficulty concluding that accommodation of the need to express breast milk readily fits into a reasonable definition of pregnancy, childbirth, or related medical conditions. As such, Plaintiff's access to facilities to express breast milk is relevant to whether Defendant discriminated against her based on her pregnancy.") (internal citations and quotation marks omitted).

This court need not decide whether and to what extent United was required to accommodate Lara-Woodcock, however, because the record demonstrates that United did accommodate her needs for break time and a facility in which to express breast milk. Her claim that she would have to sit on a toilet seat to pump is not supported by the record. The bathroom/locker room made available to her had benches. United stated that it would provide a locking refrigerator and a lock on the door, and there is no evidence in the record suggesting that it would not fulfill that promise. Lara-Woodcock did not base her refusal to return to work on the fact that the lock had not been installed; she did not verify whether this had been done. The record also shows that Lara-Woodcock's decision that she could not express breast milk at work

was made unilaterally. There is no evidence that she made any attempt to negotiate a more appropriate or comfortable solution to her needs. Rather, she simply failed to report to work when ordered to do so, then argued after-the-fact that she had not been appropriately accommodated.

Because Lara-Woodcock's absence from work was not authorized, United was justified in dismissing her according to Rule of Conduct 33. *See Dormeyer v. Comerica Bank–Illinois*, 223 F.3d 579, 583 (7th Cir. 2000) ("[T]he Pregnancy Discrimination Act does not protect a pregnant employee from being discharged after her absence from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of nonpregnant employees are overlooked."); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994) ("The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but . . . not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees."). Lara-Woodcock was absent from work without authorization, in violation of the Rules of Conduct, and she presents no evidence that other United employees were not discharged for similarly lengthy unauthorized absences from work. Her failure to do so dooms her claim that her termination was discriminatory.[9]

## B. Retaliatory Discharge

Lara-Woodcock claims that United terminated her in retaliation for her refusal to express breast milk on a toilet. She contends that her refusal to do so was a refusal to abet United in its

---

[9]     Lara-Woodcock argues in her response that the requirement that she sign a waiver releasing her claims as part of the settlement that would have granted her a voluntary furlough was also retaliatory. But this claim is not in her complaint, and the court deems any theory of liability based on the waiver to be waived. It is well established that a plaintiff "may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *E.E.O.C. v. Lee's Log Cabin, Inc*., 546 F.3d 438, 443 (7th Cir. 2008).

violation of public policy and the Illinois Nursing Mothers Act. She claims that in terminating her, United committed the tort of retaliatory discharge, in violation of Illinois law.

As explained by the Illinois Supreme Court, the tort of retaliatory discharge "is an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009). To prevail on a retaliatory discharge claim, a plaintiff must establish that she was discharged "in retaliation for her activities," and "that the discharge violates a clear mandate of public policy." *Id.*

Lara-Woodcock argues that she was discharged because she refused to allow United to disregard the requirements of the Illinois Nursing Mothers Act. That Act provides that an employer must "provide reasonable unpaid break time each day to an employee who needs to express breast milk for her infant child," 820 Ill. Comp. Stat. 260/10, and must "make reasonable efforts to provide a room or other location, in close proximity to the work area, other than a toilet stall, where an employee . . . can express her milk in privacy," *id*. at 260/15.

The record in this case, however, shows that—as explained above—United did not discharge Lara-Woodcock "in retaliation for her activities," but rather for her unexcused absence from work. Moreover, the discharge did not violate the Illinois Nursing Mothers Act or public policy, because the record shows that United made reasonable efforts to accommodate Lara-Woodcock's need to use a breast pump at work. Nothing in the record suggests that the proposed accommodations would not have been sufficient to allow Lara-Woodcock to continue expressing milk for her children. Nor does the record support Lara-Woodcock's contention that she would have been required to sit on a toilet seat in order to have any privacy. At deposition Lara-Woodcock testified that she did not think the bathroom/locker room was sufficiently private and sanitary, but there is no evidence that she raised those issues to United and attempted to find

a more satisfactory accommodation of her need to pump. United's motion for summary judgment is therefore granted as to the retaliatory discharge claim.

### III. CONCLUSION

For the reasons explained above, United's motion for summary judgment is granted in its entirety. The clerk is directed to terminate this case.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: November 20, 2013